UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIE DEBARDELABEN, JR.,

      Plaintiff,                    Civil Action No. 04-74504

v.                              HON.  PAUL D. BORMAN
                              U.S. District Judge
                              HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL        U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. §405(g) challenging a final  decision of Defendant Commissioner denying his application for Disability Insurance Benefits and Supplemental Security Income under Title II of the Social Security Act.   Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On November 2, 1999 Plaintiff filed applications for Disability Insurance Benefits (DIB)and Supplemental Security Income (SSI), alleging an onset date of December 20, 1997

(Tr. 45-47).[1]  ALJ Ransom held a rehearing on March 17, 2003 in Flint, Michigan  (Tr. 262-275).  Plaintiff, represented by attorney, Darren Andrus, testified (Tr.  265-269), as did Melody Henry, a vocational expert, (VE) (Tr. 269-272).  ALJ Ransom found that Plaintiff was not disabled because although unable to perform his past relevant work, he could perform other work which existed in significant numbers in the national economy (Tr. 26).  On June 11, 2004, the Appeals Council denied review (Tr. 6-8).  Plaintiff filed for judicial review of the final decision on November 18, 2004.

## BACKGROUND FACTS

Plaintiff,  born August 22, 1953, was age forty-nine when the ALJ issued his decision on June 23, 2003  (Tr. 27).  He received a BA in political science (Tr. 236).  He worked previously as a construction laborer, truck driver, janitor, light equipment operator, cashier, machine operator, and asbestos remover (Tr. 19).  Plaintiff alleges disability due to neck, back, knee, and shoulder injuries, as well as "nerves" and depression (Tr. 19).

-----

[1]As discussed below, Plaintiff's November 2, 1999 application was denied after an administrative hearing on November 1, 2000 (Tr. 30).  The Appeals Council subsequently remanded the case for further proceedings, stating that the ALJ's credibility determination was not adequately supported, and directing the ALJ to "obtain updated medical records from [Plaintiff's] treating and other medical sources" if necessary to determine disability (Tr. 206-208).

A.      **Plaintiff's Testimony[2]**

      1.  **November 1, 2000**

Plaintiff, born August 22, 1953, stated that he completed a bachelor's degree in 1975 in political science (Tr. 235-236).  He reported that he currently lived with a friend and her adult son and had not worked since December 20, 1997, adding that he had recently settled a Workers' Compensation claim in November of the previous year (Tr. 233, 235).  He stated that he was terminated from his most recent manual labor job in August, 1997 after informing his employer in May or June, 1997, that his neck and back pain prevented him from continuing to work[3] (Tr. 235).  He reported that he worked as truck driver until May or early June, 1998 (Tr. 239).

He stated that he had experienced discomfort since a work injury which had pinned him between a platform and a hot pipe (Tr. 238).  He reported that he also sustained second degree burns as well as neck and back problems (Tr. 238).  He reported that in addition to neck and back pain, he experience recurring pain in his right knee due to a past injury (Tr. 237).  He stated that he had been treated for a torn rotator cuff and Carpel Tunnel Syndrome (CTS) (Tr. 241).  He testified that he experience hand and wrist numbness which  often prevented him from gripping small objects (Tr. 242).  He claimed that he first experienced

---

[2]Since the ALJ apparently intended that the post-remand hearing would supplement, rather supercede the original hearing transcript, testimony from both hearings is included.

[3]Plaintiff's later testimony suggests that he held this position until the spring of 1998 rather than 1997 (Tr. 240).

CTS after undergoing a myelogram (Tr. 242).  He also reported lower back and leg stiffness (Tr. 243).

Plaintiff reported that he could stand for up to twelve minutes, walk a maximum of three blocks, that he avoided climbing stairs, and that he was unable to carry anything (Tr. 243-244).  He estimated that he could sit for up to an hour in a comfortable chair (Tr. 249). He stated that he experienced sleep disruption due to pain and sleep apnea, which along with his medication obliged him to nap for approximately three hours each day (Tr. 244-245).  He reported that he spent the rest of his time watching television or visiting a relative's house (Tr. 245).  He indicated that on "good days," he could perform minor household chores such as washing dishes, adding that he generally experienced no more than three good days a month (Tr. 246-247).

Plaintiff testified that he suffered from depression and had sought counseling twice, indicating that the treatment required him to "just sit around and just think" (Tr. 247).  He reported that his counselors told him that he was "too far gone" for treatment (Tr. 247).  He stated that he enjoyed good relationships with "[c]ertain people," indicating that he no longer socialized frequently (Tr. 248).  He reported that he no longer engaged in sports, but continued to play cards (Tr. 248).

He stated that he was taking only over-the-counter pain relievers at the time of hearing due to his inability to obtain a Medicaid card (Tr. 250).  He indicated that treatment for sleep apnea had been unsuccessful (Tr. 251).  Plaintiff, 6', estimated that he weighed between 240 and 250 pounds (Tr. 252).  Plaintiff admitted that he had been convicted of driving while

-4-

intoxicated (DWI) as recently as 1996, but stated that he had not used alcohol since he left his most recent job (Tr. 253).

### 2. March 17, 2003

Plaintiff testified that he had not drawn an income since his last hearing (Tr. 265). He reported that he had not obtained medical insurance and could not afford to purchase a CPAP machine to treat his sleep apnea (Tr. 265). He stated that his discomfort due to a herniated cervical disk and cervical stenosis had worsened since November, 2000 (Tr. 266). In addition, he reported that he also experienced increasing lumbar back and leg pain, CTS, and severe depression (Tr. 266). He stated that he took only over-the-counter pain relievers (Tr. 266). He testified that he napped "throughout the day" (Tr. 268).

### B.    Medical Evidence

An MRI performed in September, 1997 showed a moderate central disc herniation at C4-5 (Tr. 98). Plaintiff received a work restriction with instructions to avoid overhead work and the use of vibrating tools (Tr. 101).

In January, 1998, Plaintiff complained to Victor G. Sonnino, M.D., of numbness in both arms (Tr. 102). Dr. Sonnino noted that nerve conduction studies revealed only right hand problems (Tr. 102). Dr. Sonnino issued a four week work release pending followup evaluations (Tr. 102).

In February, 1998, Neil Friedman, M.D., examined Plaintiff on behalf of Michigan Mutual Insurance Company (Tr. 106). Noting that an earlier MRI had shown a disc herniation and associated spinal canal stenosis, he concluded that Plaintiff should restrict his

physical activities (Tr. 112).

In June, 1998, Plaintiff sought treatment at St. Mary's Medical Center complaining of neck pain (Tr. 119) He told treating staff that he was currently undergoing therapy for a work injury (Tr. 119). Discharge notes indicate that he was taking Darvocet and Motrin (Tr. 120).

In August, 1998 Gavin I. Awerbuch, M.D., gave Plaintiff a one month work release (Tr. 144). In December, 1999, Plaintiff reported that he wished to continue conservative care for back pain (Tr. 133). In January, 1999, Dr. Awerbuch stated that Plaintiff should remain off work "during . . .this time," without setting a back-to-work date (Tr. 143). In March, 1999, he reiterated that Plaintiff should stay off work, opining that Plaintiff was a candidate for surgery (Tr. 132). In April, 1999, nerve conduction studies showed bilateral CTS and left C5-6 radiculopathy (Tr. 130). In July, 1999, he noted that although Plaintiff still experienced neck, back, and shoulder pain, he did not show symptoms of spinal cord compression (Tr. 129). Dr. Awerbuch noted that Plaintiff would be treated symptomatically, adding that he believed that Plaintiff would require surgical intervention in the future (Tr. 129).

In March, 1999, Stephen Wilson, M.D., performed a disability evaluation of Plaintiff (Tr. 124-126). Plaintiff reported that he had experienced neck, right elbow, and leg pains, along with numbness in his hand, left shoulder and lower back, describing his pain as a "9" on a 10-point scale (Tr. 124). Dr. Wilson noted a history of depression, bilateral carpal tunnel syndrome, a herniated disc with radiculopathy, and rotator cuff derangement (Tr. 124). He stated that Plaintiff currently took Tylenol #3 and Motrin 800 mg. (Tr. 125). He

-6-

reported that Plaintiff retained the ability to perform laundry chores, drive, and bathe independently (Tr. 125).

In January, 2000, L. D. Hendricks, D.O., examined Plaintiff on behalf of SSA (Tr. 146). He noted that Plaintiff was not currently taking any prescription medications, and that Plaintiff complained of headaches, arm numbness, along with back and neck pain (Tr. 146). Plaintiff told Dr. Hendricks that he could not afford additional testing for his sleep apnea (Tr. 146).

In January, 2000 Debra N. Urusky, M.A., performed a psychological examination of Plaintiff (Tr. 150). Plaintiff told Ms. Urusky that he had experienced depression throughout most of the 1990s (Tr. 150). Plaintiff's self-esteem was deemed impaired and he presented "in an angry and depressed fashion" (Tr. 153). Urusky assigned Plaintiff a GAF of 50, finding that his prognosis is "guarded at this time" (Tr. 155).[4]

In February, 2000, a Physical Residual Functional Capacity Assessment concluded that Plaintiff retained the ability to lift twenty pounds occasionally and ten pounds frequently, along with the ability to stand and/or walk for about six hours in an eight hour workday and sit for approximately six hours (Tr. 158). The assessment found additionally that Plaintiff retained unlimited abilities to push and pull, and did not require communicative or visual restrictions, but limited Plaintiff to only occasional balancing, stooping, kneeling, crouching,

_____

[4]A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (*DSM-IV-TR* ) (4th ed.2000).

and crawling, as well as precluding all climbing  (Tr. 158-161).  The assessment concluded by stating that Plaintiff's "perceived  functional limitations are not consistent in  severity" with his medical records, deeming Plaintiff only "partially credible" (Tr. 162).

A Mental Residual Functional Capacity Assessment performed the same month found that Plaintiff experienced moderate limitations in his ability to understand, remember, and carry out detailed instructions, as well as in the ability to maintain attention and concentration for extended periods (Tr. 165).  The same evaluation found that Plaintiff also experienced moderately limited abilities to interact appropriately with the general public and  coworkers (Tr. 166).  The report concluded by stating that although Plaintiff could not perform "complex/technical instructions on a sustained basis" due to depression, he retained the ability to perform simple tasks (Tr. 167).

A Psychiatric Review Technique Form (PRTF) completed the same day found that Plaintiff experienced depression characterized by sleep disturbance, psychomotor agitation, and concentrational difficulties (Tr. 172). The medical examiner found that Plaintiff experienced moderate difficulties in maintaining social functioning, as well as "often" suffering from deficiencies of concentration, persistence, or pace (Tr. 176).

## C.  Vocational Expert

### 1. November 1, 2000

Vocational rehabilitation counselor Stephanie Leech classified Plaintiff's former jobs at the following exertional and skill levels:  construction laborer (very heavy, unskilled), truck driver (light, semi-skilled), janitor (medium, unskilled), and light equipment operator

-8-

(light, semi-skilled) (Tr. 97).  She found, assuming that Plaintiff's testimony were deemed credible, that his alleged need to nap for several hours each day precluded full time employment (Tr. 255).  The ALJ posed the following hypothetical question to the VE:

> "If he could perform light work, but he'd require a job with a sit/stand option, no repetitive bending, twisting or turning, no air or vibrating tools, no production line use of his upper extremities, no overhead work and it would need to be simple, repetitive type work.  Assuming those facts, in your opinion, would there be jobs in existence in significant numbers in the regional economy that he could perform?"
> (Tr. 255-256).

The VE replied that Plaintiff could perform the following jobs at the light exertional level: Gate security guard (1,500 jobs), greeter (1,000 jobs), inspection work (5,000 jobs), and janitorial work (3,500 jobs).  At the sedentary exertional level, the VE testified that Plaintiff could perform the work of visual inspector (2,500 jobs), security monitor (2,000), and general clerking positions (10,000 jobs).

## 2.  March 17, 2002

VE Melody Henry testified that in addition to Plaintiff's work experience listed in preparation for the previous hearing, he had formerly performed the jobs of cashier (light, unskilled), machine operator (light, unskilled), and asbestos remover (very heavy, unskilled)[5] (Tr. 224).  She stated that based on Plaintiff's testimony that he needed to nap several times a day, all gainful employment would be precluded (Tr. 270).  The ALJ posed the following hypothetical question:

---

[5]In contrast to VE Stephanie Leech's classification of the light equipment operator as "light," VE Henry termed the same job as requiring a "very heavy" exertional level (Tr. 224).

"Now, assume for me, if you would, that he could perform light work; he'd (sic) require a sit/stand option; no repetitive bending, twisting, turning, crawling, squatting, kneeling, climbing; no air or vibrating tools; no production-line use of his upper extremities; and would need to be simple, repetitive work; no overhead work; and lastly, no prolonged or repetitive rotation, flexion, or extension of his neck . . . . [W]ould there be jobs in existence in significant numbers in the regional economy that he could perform?"

(Tr. 270).

The VE replied that such an individual could perform a number of unskilled jobs at the light exertional level including positions as a counter-clerk (2,100 jobs), rental clerk (2,000 jobs), office-machine-operator (1,110 jobs), and general office-clerk (4,550 jobs) (Tr. 271). She stated that her testimony conformed with the Dictionary of Occupational Titles and its companion publications (Tr. 271). In response to questioning by Plaintiff's attorney, she stated that her findings were not applicable to an individual who lacked the concentration, persistence, and pace to perform even unskilled work because of deficits in concentration due to pain and depression (Tr. 272).

**D.   The ALJ's Decision**

Based on testimony taken at both the 2001 and 2003 hearings, the ALJ found on June 23, 2003 that although Plaintiff experienced the severe impairments of a herniated cervical disc, cervical stenosis, lumbar pain, bursitis, depression, and possible sleep apnea, none was severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (Tr. 22). He concluded that although Plaintiff could not perform his past relevant work, he retained the capacity to perform a significant range of

-10-

light work, including jobs as a counter clerk, rental clerk, office clerical worker, and office machine operator (Tr. 26).

The ALJ supported his determination by stating that he found Plaintiff subjective complaints "not fully credible" (Tr. 23). He noted that Plaintiff "voluntarily removed himself from employment," adding that Plaintiff's lack of treatment detracted "from the alleged severity of [Plaintiff's] symptomatology" (Tr. 24). He found that "evidence of record does not support [Plaintiff's] alleged need to lie down an inordinate amount of time during the day" (Tr. 24).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services,* 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the

-11-

administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.  Hypothetical Question

Plaintiff argues that the ALJ erred at the March 23, 2003 hearing by failing to include all of Plaintiff's relevant limitations in his hypothetical question. *Plaintiff's Brief* at 9.  He

maintains that the ALJ's question to the VE, which limits Plaintiff to "simple, repetitive work," did not properly address Plaintiff's deficiencies of concentration, persistence, or pace. *Id.* at 9-14. Plaintiff cites *Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 779 (6ᵗʰ Cir. 1987) which states that "[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question, but only if the question accurately portrays [the] plaintiff's individual physical and mental impairments." (internal citations omitted). *Id.* at 9.

The ALJ's hypothetical question, read in its entirety, properly acknowledges his own findings, drawn from the January, 2000 PRTF, that Plaintiff suffers from moderate deficiencies in concentration, persistence, and pace[6] (Tr. 23, 176). In the past, this Court has recognized that moderate deficiencies in pace must also be reflected in the hypothetical question. In *Bankston v. Commissioner,* 127 F. Supp. 2d 820, 826 (E.D. Mich. 2000), the Court found that "a mental deficiency occurring 'often' may not be consistent with substantial gainful employment." Likewise, "moderate" deficiencies, which also mark the midpoint of a five-point scale, suggest substantial limitations which should be acknowledged in the hypothetical question. The fact that a job is simple and routine has nothing to do with whether or to what degree a worker's moderate deficiencies in concentration will affect the timely completion of that job, and indeed, courts have found such descriptions insufficient

---

[6]The January, 2000 PRTF, which rated Plaintiff's limitation at the midpoint of a five-point scale, (never, seldom, often, frequent, and constant) has since been replaced with another five-point scale (none, slight moderate, marked, and extreme). The ALJ's findings of "moderate" deficiencies reflects the newer terminology (Tr. 23).

to address deficiencies in pace.  *See, e.g., Newton v. Chater,* 92 F.3d 688, 695 (8th Cir. 1996); *McGuire v. Apfel,* 1999 WL 426035, 15 (D. Or.  1999).  Nor does the qualifier "low stress" effectively "capture the concrete consequences" of Plaintiff's limitations in pace.  *Roe v. Chater,* 92 F.3d 672, 676-77 (8th Cir.  1996).  Stress does not necessarily correlate with pace and the ability to complete tasks in a timely manner over an eight-hour workday.

However, while the Court recognizes that generally, a failure to account for pacing deficiencies constitutes reversible error,  in the present case, the hypothetical question, read in its entirety, accounts for Plaintiff's moderate deficiencies by proscribing "*production line use* of  [Plaintiff's] upper extremities" (emphasis added) (Tr. 255-256).  Further, the VE's job findings, which omit *all* production work, indicate that her answers properly accounted for both Plaintiff's physical and mental limitations by citing non-production type positions such as rental clerk, office-machine operator, and general office clerk (Tr. 271).  Although Plaintiff's discussion contains generally useful guidelines in determining the adequacy of a hypothetical question, the job findings in the present case comport with Plaintiff's pacing and concentrational limitations.  *See Smith v. Halter,* 307 F.3d 377, 379 (6th Cir. 2001) ("The ALJ went beyond  [a] simple frequency assessment to develop a complete and accurate assessment of [the plaintiff's] . . . impairment.")

## B.  Appeals Council Remand

Plaintiff also maintains that ALJ Ransom failed  to follow the Appeals Council's remand order, which he argues required the ALJ to order additional  "orthopedic and/or mental status examinations." *Plaintiff's Brief* at 8.  Plaintiff argues that additional records are

-14-

crucial to the ALJ's disability determination, since at the time of the second decision, he was

within  six months of his fiftieth birthday.[7]

The relevant portion of the June 4, 2002 Appeals Council remand order states as

follows:

> As appropriate, the Administrative Law Judge will obtain updated medical
> records from [Plaintiff's] treating and other medical sources, including clinical
> findings, test results, and medical source statements about what [Plaintiff] can
> do despite the impairments(s). . . . ¶If the additional evidence does not
> adequately clarify the record, the Administrative Law Judge will recontact the
> medical source(s) for further information (20 CFR 404.1512(e)).   If the
> additional evidence does not clearly depict [Plaintiff's] limitations, the
> Administrative Law Judge will obtain consultative orthopedic and/or mental
> status examinations, including medical source statements about what [Plaintiff]
> can do despite the impairment(s).  In obtaining the additional evidence, the
> Administrative Law Judge will be guided by the procedures set forth in 20
> CRF 404.1512.  ¶Further, if necessary, the Administrative Law Judge will
> obtain evidence from a medical expert to clarify the nature and severity of
> [Plaintiff's] impairment(s) (20 CFR 404.1527(f) and [SSR] 96-6p).
> (Tr. 207).

Although Plaintiff asserts that the Appeals Council decision required ALJ Ransom to

order additional medical tests,  the order indicates that additional medical records should be

updated *to the extent  appropriate* to determine disability.   The order goes on to require the

ALJ to order consultive exams  *in the event*  Plaintiff's condition is not "clearly depicted."

---

[7]20 CFR § 404.1563 (d) states, "If you are closely approaching advanced age (age 50-
54), we will consider that your age along with a severe impairment(s) and limited work
experience may seriously affect your ability to adjust to other work." A finding that a
claimant closely approaching advanced age with skills analogous to Plaintiff's could perform
only sedentary work would generally direct a finding of disabled.  "The 'grid,' Pt. 404,
Subpt. P, App. 2, directs a finding of disabled if plaintiff had a residual functional capacity
(RFC) for sedentary work, § 201.09, but not if his RFC is light, § 202.10."  *Davis v.
Secretary of Health and Human Services* 634 F.Supp. 174, 177 (E.D.Mich.,1986)

*See Goff v. Barnhart* (8th Cir. 2005); 20 C.F.R. § 404.1512(e) ("[C]ontacting a treating physician is necessary *only if* the doctor's records are 'inadequate for us to determine whether the claimant is disabled.'" (emphasis added)). Further, the order conditions the need for an additional medical expert "if necessary . . . to clarify the nature and severity of [Plaintiff's] impairment." *See Skarbek v. Barnhart,* 105 Fed.Appx. 836, 839 (7th Cir. 2004); 20 C.F.R. § 404.1527(f)(2)(iii) ("Here, the evidence was adequate for the ALJ to find Skarbek not disabled, and the ALJ acted within his discretion in deciding not to call a medical expert.")

In the present case, the ALJ, providing ample reasons for his non-disability finding, noted that in the two and a half year interim between the administrative decisions, Plaintiff had not engaged in physical therapy or sought medical treatment for his condition besides over-the-counter pain medication (Tr. 23). While SSR 96-7p states that "[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide," the ALJ in this case properly discussed Plaintiff's stated reasons for his absence of regular treatment before making his disability finding. He noted that Plaintiff blamed his failure to seek treatment on the inability to obtain medical insurance and lack of mobility. However, in rejecting Plaintiff's explanation, the ALJ observed that Plaintiff continued to drive and lived with his girlfriend who was employed (Tr. 22). The ALJ reasonably attributed Plaintiff's failure to seek additional treatment to his lack of motivation, citing his comment to his treating physician that he was unwilling to drive to Ann Arbor to obtain an orthopedic evaluation and statement to a

-16-

consultive psychologist that his future plans consisted of "sitting around and watching television" (Tr. 23, 154).

Having cited legitimate reasons, culled from the record, to support his finding that Plaintiff was unwilling rather than unable to produce documents demonstrating disability, the ALJ was then entitled to conclude from the dearth of recent medical records (along with past records pointing to a non-disability finding) that Plaintiff was not disabled. "The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." *Stormo v. Barnhart,* 377 F.3d 801, 806 (8th Cir. 2004). A rule promulgated in 2003 clarifies this distinction: "[T]he only burden shift that occurs at step 5 is that we are required to prove that there is other work that you can do, given your RFC, age, education, and work experience. That shift does not place on us the burden of proving RFC." 68 FR 51153, 51155. *See also Harris v. Barnhart,* 356 F.3d 926, 931 n. 2 (8th Cir.2004).

While Plaintiff has presented thoughtful arguments in favor of a remand, the overriding question in this appeal remains whether the ALJ's decision was supported by substantial evidence. If it was, then the decision must be affirmed even if this Court might find differently if the case were reviewed *de novo*. Based on a review of this record as a whole, the ALJ's decision is within the "zone of choice" accorded to the fact-finder at the administrative hearing level, *Mullen v. Bowen, supra,* and should not be disturbed by this Court.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

S/R. Steven Whalen
R. STEVEN WHALEN

                              UNITED STATES MAGISTRATE JUDGE

Dated:  October 3, 2005


                              CERTIFICATE OF SERVICE


The undersigned certifies that a copy of the foregoing order was served on the attorneys
and/or parties of record by electronic means or U.S. Mail on October 3, 2005.



                              S/Gina Wilson_____
                              Judicial Assistant